**Affirmed in Part, Reversed and Rendered in Part, and Reversed and Remanded in Part and Opinion filed May 7, 2019**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00557-CV

---

## MAURICE SLOANE II, Appellant

## V.

## GOLDBERG B'NAI B'RITH TOWERS, Appellee

---

**On Appeal from the County Civil Court at Law No. 2
Harris County, Texas
Trial Court Cause No. 1082565**

---

## OPINION

This is an appeal from a judgment in a forcible detainer suit. Appellee Goldberg B'Nai B'Rith Towers (Goldberg) is the owner of a high-rise apartment building that operates under a federal low-income housing program. Appellant Maurice Sloane, II is a tenant in the building. Goldberg filed the forcible-detainer action seeking Sloane's eviction based on several alleged non-rent breaches of the lease agreement. Both the justice court and, on appeal, the county civil court at

law, ordered Sloane evicted from the apartment. The county court also awarded attorneys' fees and back rent to Goldberg. Sloane appeals the judgment in three issues, arguing jury charge error, lack of sufficient evidence to support the award of attorney's fees, and lack of sufficient evidence to support the award of back rent. We overrule Sloane's first issue but sustain his second and third issues. We therefore affirm in part, reverse and render in part, and reverse and remand in part, the trial court's judgment.

## BACKGROUND

Goldberg operates the residential high-rise under a program established through the Secretary of Housing and Urban Development (HUD). Under that program, Goldberg agreed to limit occupancy of the high-rise to elderly or handicapped families and individuals as defined in Section 202 of the Housing Act of 1959 and applicable federal regulations. Sloane, who is elderly and handicapped, signed a one-year lease for apartment 4407 of the high-rise on June 15, 2007, and receives monthly rental assistance from HUD.

The lease incorporated House Rules that governed the relationship of the parties and proscribed certain behaviors. Under the House Rules, tenants agree that they will refrain from conduct that "would conflict with the rights of other residents to peaceful enjoyment of the premises." Conduct considered disturbing under the House Rules includes "bullying of any sort" as well as "abusive or foul language." The House Rules also state that Goldberg may terminate the lease of any resident "who is or has been engaged in criminal activity that could reasonably indicate a present threat to the health, safety or welfare of others."

Pursuant to the terms of the lease and applicable federal regulations for HUD properties, the lease automatically renews for successive terms of one month each "unless terminated or modified as provided" in the lease. Section 9 of the

2

lease allows Goldberg to terminate for material noncompliance with the lease, material failure to carry out obligations under any state landlord or tenant act or for other good cause. The lease defines "material noncompliance to mean, *inter alia*, "one or more substantial violations of this Agreement," or "repeated minor violations of this Agreement which disrupt the livability of the project, adversely affect the health or safety of any person or the right of any Tenant to the quiet enjoyment of the leased premises and related project facilities, interfere with the management of the project or have an adverse financial effect on the project." The lease also provides that Goldberg may terminate the lease based on criminal activity by a tenant that "threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises)" or if Goldberg determines the tenant has engaged in criminal activity, regardless of whether the tenant has been arrested or convicted for such activity.

On June 27, 2016, Goldberg sent notice of termination of the lease to Sloane. The notice stated: "[t]he grounds for termination are material noncompliance of the Lease for the specific reasons" identified in the notice. The notice identified four incidents that Goldberg considered to be violations of the lease. The first incident involved an email Sloane sent to Goldberg's manager on October 14, 2013, which the parties refer to as "the Bengal tiger email." In the email, Sloane complained to management that the rules at Goldberg were not being enforced and made the following statements:

> If I want to put a used car in the trash room I am sure it will be OK. After all there is not a week that goes by when someone does not put a toaster, pots and pans, etc., in the trash room. If I want to walk a Bengal Tiger through the building and on the grounds, I will OK [sic] with that. After all there is a certain black dog that is walked around the grounds without a leash. . . So as soon as my tiger gets here from

India I will give you notice. You might want to carry an elephant rifle with you on your patrols of the building. If I want to pee in the elevator floor . . . well why not? There is a little dog who lives in my building that does that on a regular basis with nothing said or done. So if I happen to be in the elevator with my tiger either one of us or both might want to use the facilities . . . well, you know. . . .

Shortly after Sloane sent this email, Goldberg sent a certified letter from its attorney denying that it did not enforce the rules. The letter further stated that Sloane's threats would not be tolerated and if he carried out any of the threats Sloane would be considered in violation of his lease.

The second incident cited as grounds for termination involved Sloane's comments to Goldberg employee LaWanda Galloway. On December 21, 2015, Galloway reported to management that, on her way to the restroom Sloane was in the hallway passing the dining room. As she tried to pass him, Sloane, who uses an electric scooter for mobility, began to back up his electric scooter and nearly hit her. When Galloway told Sloane he almost hit her, Sloane said: "I wouldn't hit you I'd shoot you. I don't want to get blood on my scooter." Sloane testified that he was joking in the style of Don Rickles. Galloway, however, did not view the comment as a joke. Instead, she told management that the comments from Sloane frightened her and she would no longer work with Sloane on his recertifications.[1] Goldberg's manager Phyllis Davis had to fly in from out of state to cover recertifications with Sloane. Goldberg again sent a certified letter to Sloane from its attorney stating: "you attempted to run over one of Landlord's staff with your electric scooter on your way to the dining room and then threatened to shoot the staff member when she attempted to address the incident with you." Goldberg

---

[1] Galloway was a recertification specialist at Goldberg. A recertification specialist at a HUD property works with the tenants on an annual basis to certify the tenant remains eligible to receive the subsidized housing benefits.

4

notified Sloane that it was a violation of his lease and that any future violation of the lease and House Rules would be a basis for termination of the lease.

The third incident concerned a complaint Sloane made to Goldberg through the front desk window on May 17, 2016. On that day, Sloane was complaining about wait times at the elevator for the high-rise and stated in a loud voice he had to wait four times for an elevator because the "fat f***ing Russian broads" barge into the elevator in front of him. Sloane had previously complained about Russian female residents who had jumped in front of him to get on the elevator and felt Goldberg was doing nothing about it. Goldberg informed Sloane, again with a letter from its attorney, that Sloane excessively raised his voice on May 17, 2016 when he "complained about having to wait for the elevator and expressed vulgar and ethnic slurs against other tenants regarding such issues."[2] Goldberg again viewed Sloane's comments to be rude and threatening behavior that constituted a violation of his lease, and warned that any future rude, abusive, or threatening behavior would constitute a basis for termination.

The fourth incident cited for termination related to another email sent by Sloane on June 24, 2016. In that email, Sloane apologized for losing his temper with a visitor to the high-rise on the previous afternoon. On the previous afternoon Sloane yelled in a loud voice at visitor Yuri Chubinsky, a caregiver to another tenant, and called Chubinsky an idiot. According to Sloane, Chubinsky had a history of parking his vehicle in front of the high-rise for long periods of time when coming to pick up the tenant, and in doing so blocked the covered portion of the front entrance. At one point, Chubinsky blocked a Metro bus attempting to drop off Sloane when it was raining and caused Sloane's electric scooter to get

---

[2] Sloane denied using the word "f***ing." He conceded using the word "fat" as a way to identify the women involved.

wet. Three reports of complaints about Sloane's yelling at Chubinsky were filed with Goldberg. In his apology email on June 24, 2016, Sloane stated he "lost his temper with a man who comes to the property all the time and never signs in and leaves his car out front for a long time blocking the way for others." After making several other complaints about tenants, Sloane stated:

> It is not easy to live at this property with these rude people who do not speak English and behave like they own the building. Three times in the space of about two hours was just too much and I lost my temper with the last one. I apologize. Be thankful that I do not have a pistol. I might have shot them all. Ha!

Goldberg's manager Davis testified that Sloane's comments in the June 24, 2016 email (as well as the comment made to Galloway) were threatening and constituted criminal activity. At that point, Davis felt she had no other choice but to end Sloane's residency at the high-rise.

Goldberg sent the June 27, 2016 notice of termination and informed Sloane that the lease was being terminated effective July 7, 2016. After receiving the notice, Sloane and his daughter met with counsel for Goldberg regarding the termination. After that meeting, Goldberg and Sloane signed a document titled "Cancellation of Apartment Lease Contract," in which Sloane agreed to vacate the premises by August 1, 2016.[3] Sloane sent an email to Goldberg on July 22, 2016, stating that he rescinded the cancellation agreement, and he contends in this suit that the cancellation agreement does not comply with the requirements for terminating the lease. When Sloane had not vacated the apartment by August 1, 2016, Goldberg sent a notice giving him three days to vacate. Sloane did not move out of the premises and remains at Goldberg without Goldberg's permission.

---

[3] By cancelling the lease of his own accord, rather than being evicted, Sloane preserved his ability to obtain another rent-reduced HUD apartment. According to Davis, if Sloane is evicted, he will not be able to receive subsidized housing from another property.

6

On August 8, 2016, Goldberg filed a petition for forcible detainer in the justice of the peace court to evict Sloane from apartment 4407. Sloane filed an answer and on August 25, 2016, the justice court signed a judgment in favor of Goldberg awarding Goldberg possession of the apartment, $208 in rent, $1,500 in attorneys' fees, and $116 in court costs. Sloane appealed to the county court for a trial de novo.[4]

In county court, Goldberg amended its petition and cited additional instances of misconduct by Sloane that it contends constitute violations of the lease, including comments made by Sloane to fellow residents using rude or derogatory language, use of his electric scooter at unsafe speeds in the halls, lobby and common areas, and use of racial epithets when complaining about other people at Goldberg. Sloane filed his answer denying the allegations and pleading several affirmative defenses, including immateriality of the alleged breaches of the lease and Goldberg's own prior material breach of the lease.

The case proceeded to a jury trial in the county court. At the charge conference, Sloane requested that the court submit a question, with instructions, on excuse. Sloane's proposed question would have allowed the jury to find Sloane's failure to comply with the lease excused if the failure to comply was not material or if Goldberg previously failed to comply with a material obligation of the same lease. Sloane also requested that the trial court include an instruction for the term "material" that would have included the common law materiality factors set forth in *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004). The trial court discussed and refused on the record at the charge conference to submit the proposed question on excuse and the instruction on materiality, though the trial court did not endorse the tendered question and

---

[4] *See* Tex. R. Civ. P. 510.10(c).

instruction as refused.

The trial court submitted five questions to the jury. Question 1 asked whether Sloane failed to comply with the lease agreement and included as instructions the provisions of the lease related to material noncompliance and criminal activity. The jury answered "yes." Question 2 asked whether Sloane failed to comply with the Cancellation of Apartment Lease Contract, to which the jury answered "yes." Question 3 asked whether Goldberg has "a right of possession of the Leased Premises," to which the jury answered "yes." Question 4 asked what sum of money should be assessed against Sloane for amounts due Goldberg for unpaid rent, to which the jury answered $1,869.00. Question 5 asked what sum should be awarded against Sloane for attorneys' fees, to which the jury responded $46,961.69 for representation through trial, $10,000.00 for representation in the court of appeals, and $10,000.00 for representation in the Supreme Court of Texas.

The trial court rendered a judgment of possession in favor of Goldberg based on the jury's verdict and awarded $46,961.69 in attorneys' fees, plus $20,000.00 in conditional appellate attorneys' fees, and $1,869.00 in unpaid rent. The trial court expressly stated in its judgment that Goldberg terminated Sloane's right to occupy the leased premises "as required by law," that Sloane refused to vacate, and that Sloane is thereby guilty of forcible detainer. This appeal followed.

## ANALYSIS

Sloane raises three issues on appeal: (1) whether the trial court erred in refusing to charge the jury with his affirmative defenses and instruction; (2) whether the evidence was legally sufficient to support the award of attorneys' fees; and (3) whether the evidence was legally and factually sufficient to support the award of unpaid rent. We address each issue in turn.

8

**I.     The trial court did not err in refusing Sloane's requested jury question and instruction.**

Sloane contends that the trial court should have submitted his requested affirmative defenses of prior material breach by Goldberg and immateriality of his own breach.  We disagree.

**A.     Standards of review**

We review a trial court's decision on jury charge issues for an abuse of discretion.  *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam); *Hiles v. Arnie & Co., P.C.*, 402 S.W.3d 820, 830 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).  A trial court abuses its discretion in refusing to submit a requested question or instruction if the pleadings and evidence raise the issue.  *See Hiles*, 402 S.W.3d at 830.  A trial court does not abuse its discretion if it refuses to submit unnecessary instructions, even if the instruction is a correct statement of the law.  *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 722 (Tex. App.—Houston [14th Dist.] 2017, no pet.).  In addition, a trial court's error in refusing a request or instruction is reversible only if the refusal probably caused the rendition of an improper judgment or probably prevented the appellant from presenting its case on appeal.  *Id.*; *see also Shupe*, 192 S.W.3d at 579 (noting error may be harmless based on other findings that support the judgment).  To determine whether an alleged error in the jury charge is reversible, we consider the pleadings, the evidence at trial, and the charge in its entirety.  *See Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 653 (Tex. App.—Dallas 2002, pet. denied).

**B.  There is no reversible error in the jury charge.**

In this case, Sloane's third amended answer contained the affirmative defenses of: (1) Goldberg's prior material breach; and (2) immateriality of his own

alleged breach.  Prior to the charge conference, Sloane tendered a proposed jury question that would have asked whether Sloane's breach was excused on the basis of these two affirmative defenses.[5]  Sloane also tendered a requested instruction on materiality that listed the common law factors adopted in *Mustang Pipeline*.[6]  The trial court discussed the requested question with the affirmative defenses and instruction on materiality at the charge conference and refused to give them. Sloane thus preserved his jury charge issue for our review.  *See Hiles*, 402 S.W.3d at 831.[7]

In assessing alleged jury charge error, the question on appeal is whether Sloane's requested question on his affirmative defenses, and his requested instruction on materiality were "reasonably necessary to enable the jury to render a

---

[5] The tendered question also included an instruction that would allow the jury to find Sloane's failure to comply excused based on the statute of limitations.  Sloane does not raise the failure to submit his affirmative defense of limitations as an issue on appeal.

[6] Those factors include: (1) the extent to which the injured party will be deprived of the benefit it reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances; (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.  *Mustang Pipeline*, 134 S.W.3d at 199.

[7] Goldberg argues that Sloane did not preserve his jury charge issue for review because he did not tender the requested question and instruction to the trial court at the charge conference and obtain a ruling.  We disagree.  As we explained in *Hiles*, "[w]hen determining whether a complaint of charge error is preserved, we ask whether the complaining party 'made the trial court aware of the complaint, timely and plainly, and obtained a ruling.'"  402 S.W.3d at 831 (citing *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992)). Here, the trial court discussed the requested question and instruction on the record at the charge conference and explained at some length why the court was refusing to submit the question and instruction.  Sloane made the trial court aware of his complaint and obtained a ruling on the record at the charge conference.  This was sufficient to preserve the jury charge issue for our review.  *See Rosell*, 89 S.W.3d at 657 (holding party preserved error when party offered instruction and objected when not submitted; trial court's ruling on objection was sufficient despite lack of endorsement of "refused" on proposed instruction).

proper verdict." *Id.*; *see also Klentzman v. Brady*, 456 S.W.3d 239, 265 (Tex. App.—Houston [1st Dist.] 2014, *aff'd*, 515 S.W.3d 878 (Tex. 2017)) (explaining requested jury question must control disposition of the case, be raised by the pleadings, and properly submit disputed issues).

### 1. *Applicable law of forcible detainer*

It is well-settled that a forcible detainer action is designed to be "a speedy, simple, and inexpensive means" for obtaining immediate possession of the property at issue. *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 919 (Tex. 2013); *Marshall v. Hous. Auth. of San Antonio,* 198 S.W.3d 782, 787 (Tex. 2006). Thus, the only issue for the factfinder to determine is the right to possession.[8] *See* Tex. R. Civ. P. 510.3(e) (stating court must adjudicate right to actual possession and not title); *Fandey v. Lee*, 880 S.W.2d 164, 168 (Tex. App.—El Paso 1994, writ denied) ("The principal purpose of a forcible detainer, or forcible entry and detainer action, is to determine who has the right to immediate possession of the premises."). A landlord is entitled to possession under a forcible detainer action when the landlord lawfully terminates a tenant's lease. *See* Tex. Prop. Code § 24.002; *Moon v. Spring Creek Apartments*, 11 S.W.3d 427, 435 (Tex. App.—Texarkana 2000, no pet.) (stating "it is the lawful termination of the lease that gives rise to the landlord's legal right to possession").

When the plaintiff in a forcible detainer is a federally-regulated housing entity, such as Goldberg in this case, the plaintiff must establish that the lease was terminated in accordance with the applicable federal regulations. *See Nealy v. Southlawn Palms Apartments*, 196 S.W.3d 386, 390 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Moon*, 11 S.W.3d at 433; *see also Geters v. Baytown Hous.*

---

[8] We recognize the understandable frustration associated with the accessibility issues and complaints raised by Sloane. However, in a forcible detainer action we are focused exclusively on the right to possession.

*Auth.*, 430 S.W.3d 578, 582 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting "[t]he right of a public housing tenant to remain in his or her housing is entitled to due process protection") (internal quotations and citations omitted). Sloane's lease provides that Goldberg's "right to terminate this Agreement is governed by the regulation at 24 CFR Part 247." It then lists reasons under the HUD regulation for which the landlord may terminate the agreement, including: (1) when the Tenant is in material noncompliance with the agreement, as defined under the agreement; and (2) when the Tenant has engaged in criminal activity, regardless of whether the Tenant was arrested or convicted. The dispositive issue in the case is thus whether Goldberg lawfully terminated the lease in accordance with the HUD regulation as stated in the lease.

## 2. *Prior material breach not necessary under the evidence.*

Sloane argues the affirmative defense of prior material breach should have been submitted because there was evidence that Goldberg failed to enforce the House Rules as to other tenants before Sloane himself violated the House Rules. He cites as examples, the complaints he made in the Bengal tiger email regarding Goldberg's failure to enforce rules related to pets, the complaints he made regarding people cutting in front of him in the elevator line, the complaints he made regarding another tenant smoking in a non-smoking area, and his complaints about Chubinsky parking in front of the building.

It is undisputed that despite these alleged prior breaches of the lease by Goldberg, Sloane treated the lease as continuing and did not himself choose to terminate the lease. The lease expressly provided that "[w]henever the Landlord has been in material noncompliance with this Agreement, the Tenant may in accordance with State law terminate this Agreement by so advising the Landlord in writing." Sloane did not do so. When a party treats a contract as continuing

12

despite the other party's prior breach, the party may not rely on prior material breach to excuse his own performance. *Long Trusts v. Griffin*, 222 S.W.3d 412, 415–16 (Tex. 2006) (per curiam) (holding that a party "who elects to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part") (quotations and citation omitted). Because Sloane treated the lease as continuing, he was required to remain in compliance with the terms of the lease. Thus, the trial court did not abuse its discretion by refusing to submit the affirmative defense of prior material breach because the evidence was undisputed that the defense did not apply. *See Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (when facts establishing existence of contract and breach are undisputed, there is no need to submit those issues to jury).

### 3. *Requested materiality question and instruction on common law factors not necessary.*

Sloane next argues the trial court erred by not submitting the common law factors to be considered in determining the materiality of a party's failure to comply with the lease agreement. Sloane does not contend that the trial court erred in providing the material noncompliance definition as stated in the lease agreement. Rather, Sloane contends both sets should have been included in the charge because the material noncompliance definitions in the lease are "not meant to replace, but are instead are [sic] in addition to the requirements of state law." We disagree that both sets of instructions should have been given.

As stated above, in cases involving a federally-subsidized landlord like Goldberg, the landlord may only terminate the lease for the express reasons stated in the lease. One of those reasons is the tenant's material noncompliance, as expressly defined in the lease. When terms in a contract are defined, those

definitions control the interpretation of the agreement. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 219 (Tex. 2003); *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 181 (Tex. App.—Houston [1st Dist.] 2018, pet. filed) ("Sometimes contracts include terms that have common law significance. A term's common-law meaning will not override the definition given to a contractual term by the contracting parties."). Because the lease agreement itself contained a definition of materiality for purposes of lease termination, the trial court did not err by instructing the jury regarding a material noncompliance in accordance with that definition from the lease. *See Southwestern Life Ins. Co. v. Rowsey*, 514 S.W.2d 802, 806 (Tex. App.—Austin 1974, writ ref'd n.r.e.) (finding no error in refusing tendered instruction where jury instruction given came from definition contained in policy).

While Sloane correctly argues that subsidized landlords must comply with state law in terminating leases, by statute the State law applicable appears to involve procedural rights, not substantive common law rights. Section 247.6(c) of the Code of Federal Regulations discusses application of state law rules to evictions from certain subsidized and HUD-owned projects such as Goldberg and states that a tenant "may rely on State or local law governing eviction procedures where such law provides the tenant procedural rights which are in addition to those provided by this subpart, except where such State or local law has been preempted under part 246 of this chapter or by other action of the United States." 24 C.F.R. § 247.6(c) (2019). This section makes clear that it is the procedural rights under State law that apply; it does not suggest that common law concepts of materiality should be submitted.

Sloane cites our decision in *Newhouse v. Settegast Heights Village Apartments*, 717 S.W.2d 131, 132 (Tex. App.—Houston [14th Dist.] 1986, no writ)

as support for his argument that both sets of materiality instructions should have been given. In *Newhouse*, we stated that "any attempt to terminate the tenancy of Newhouse (or any eligible tenant) must comply with HUD requirements, as well as with state law." *Id.*[9] But *Newhouse* did not address a substantive right of a common law definition of materiality. *See id.* Instead, *Newhouse* reiterated that subsidized landlords may not terminate a lease based on a common law right to terminate without cause, and instead may terminate only for the reasons stated in the lease. *See id.* at 133 (noting Congress rejected attempt to allow subsidized landlords to retain common law right to terminate lease with or without good cause). Consistent with Section 247.6(c), *Newhouse* stands for the proposition that subsidized landlords must follow the procedural requirements of state law for evicting tenants. It does not support Sloane's argument that common law concepts of materiality related to noncompliance with the lease should be submitted. Sloane cites no case involving a subsidized-landlord like Goldberg where the trial court found common law factors of materiality should be submitted along with the definition contained in the lease and our research has located none. We conclude the trial court did not abuse its discretion in refusing to instruct the jury on the materiality factors outlined in *Mustang Pipeline* in addition to the definition of material noncompliance in the lease.[10]

---

[9] The HUD handbook, included as an exhibit, likewise cautions owners that they must be cognizant of and follow state and local laws governing terminations.

[10] Goldberg contends that any error in refusing Sloane's requested question on his affirmative defenses is harmless because Sloane does not challenge on appeal the jury's answer to Question 2, where the jury found that Sloane failed to comply with the Cancellation of Apartment Lease Contract, or Question 3, where the jury found that Goldberg has a right of possession. Sloane responds in his Reply Brief that the answers to Question 2 and Question 3 are immaterial. We agree with Sloane regarding Question 2 because it is not clear that the trial court's judgment is based on the jury's answer to Question 2. The judgment does not mention Question 2, and the trial court indicated at trial that it would later determine whether Question 2 could support Goldberg's right of possession since the Cancellation of Apartment Lease Contract

We overrule Sloane's first issue.

## II. The attorney's fees award lacks sufficient evidence.

In his second issue, Sloane argues the trial court's award of attorney's fees in the amount of $46,961.59 for representation through trial and the $20,000.00 in conditional fees for an appeal must be reversed because there is no evidence to support the fees. We agree that the evidence of attorney's fees is legally insufficient to support the award and must be reversed.

We review a trial court's judgment awarding attorneys' fees for an abuse of discretion. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018); *PM Holdings, LLC v. Jong Song*, No. 14-15-00933-CV; 2017 WL 830552, at *6 (Tex. App.—Houston [14th Dist.] Feb. 28, 2017, no pet.) (mem. op.). A landlord may recover reasonable attorney's fees and costs under section 24.006 of the Property Code.[11] Tex. Prop. Code § 24.006(b), (d). An award of attorney's fees must be supported by evidence that the fees are reasonable and necessary. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991); *see also Venture v. UTSW DVA Healthcare, LLP*, No. 16-0006, 2019 WL 1873428, at *8 (Tex. Apr. 26, 2019) ("When fee-shifting is authorized, whether by statute or contract, the party seeking a fee award must prove the reasonableness and necessity of the requested attorney's fees.")

At trial, Goldberg's counsel Terry Sealey testified in narrative form and

does not comply with the termination procedures in the lease. Given that the trial court did not appear to render judgment on Question 2, we conclude Sloane was not required to challenge the answer to Question 2 on appeal. Likewise, given our conclusion that the trial court did not err in refusing Sloane's requested affirmative defenses, we need not reach Goldberg's argument regarding the jury's answer to Question 3.

[11] Goldberg pleaded for attorney's fees under the lease. The lease, however, does not provide for an award of attorney's fees. Nevertheless, Sloane concedes in his brief that Goldberg complied with the notice requirement for obtaining fees as a prevailing landlord under Section 24.006(a) of the Property Code and does not contest Goldberg's right to obtain fees.

under cross-examination regarding his fees. Sealey testified generally to the type of lawsuit involved, his experience, and that his hourly rate is $265 an hour. Without explanation of any details, he stated he has considered the following: the novelty and difficulty of the questions involved, the skill and requisite to perform the legal services, the likelihood that acceptance of this particular employment would preclude other employment, the fee customarily charged in the locality for similar services, the dollar amount involved, the results expected, the time limitations, nature and length of the client relationship, and the experience and reputation of his firm. Sealey then stated that a reasonable estimate of the time involved at the rate of $265 an hour comes to $46,961.69, the amount ultimately awarded by the jury for fees through trial. This evidence establishes that Sealey used the lodestar method[12] for proving his fees. *See City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) (per curiam); *PM Holdings*, 2017 WL 830552, at *6 ("When a party applies for an award of attorney's fees under the lodestar method by multiplying hours worked by a reasonable hourly fee, as did Song, it bears the burden of documenting the hours expended on the litigation and the value of those hours.").

The lodestar analysis requires an assessment of the evidence of hours worked for each attorney multiplied by their respective hourly rates to determine the total fee. *See Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014) (per curiam). There must be evidence of the time expended on particular tasks. *See id.* at 254–55; *see also El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012). The

---

[12] In *Venture*, the Supreme Court of Texas stated that the "lodestar method developed as a 'short hand version' of the *Arthur Andersen* factors and was never intended to be a separate test or method." 2019 WL 1873428, at *18. The lodestar method is a "focused and objective analysis of whether the fees sought are reasonable and necessary, yielding a base figure that reflects most *Arthur Andersen* factors and is thus presumptively reasonable." *Id.* The amount is then subject to adjustment if the presumption is overcome by other factors outside of the base lodestar figure. *Id.*

17

evidence must be sufficiently specific to allow the fact finder to determine the amount of time spent on each particular task and to decide whether that length of time was reasonable. *El Apple I*, 370 S.W.3d at 763. "A meaningful review of the hours claimed is particularly important because the usual incentive to charge only reasonable attorney's fees is absent when fees are paid by the opposing party." *Id.* at 762. "[G]eneralities about tasks performed provide insufficient information for the fact finder to meaningfully review whether the tasks and hours were reasonable and necessary under the lodestar method." *Long*, 442 S.W.3d at 255; *Hong v. Havey*, 551 S.W.3d 875, 893 (Tex. App.—Houston [14th Dist.] 2018, no pet.). A trial court's fee award cannot be based on evidence that fails to describe tasks and allocate hours spent on those tasks. *See Hong*, 551 S.W.3d at 893.

Although Goldberg argues that the lodestar method is not required in a breach of contract case such as this, the Supreme Court of Texas has recently explained that:

> It should have been clear from our opinions in *El Apple*, *Montano*, and *Long* that we intended the lodestar analysis to apply in any situation in which an objective calculation of reasonable hours worked times a reasonable rate can be employed. We reaffirm today that the fact finder's starting point for calculating an attorney's fee award is determining the reasonable hours worked multiplied by a reasonable hourly rate, and the fee claimant bears the burden of providing sufficient evidence on both counts.

*Venture*, 2019 WL 1873428, at *20. Generalized testimony that fees are reasonable is not sufficient. *See id.* at 25.

At trial, Sealey conceded that he had not allocated hours spent on particular tasks, and the invoices submitted in evidence to support Goldberg's request for fees do not break down tasks by time spent. In addition, the invoices submitted at trial provide evidence of fees only through September of 2016, in the amount of

$11,014.44. As a result, Goldberg has not presented legally sufficient evidence to support the amount awarded for attorney's fees through trial. *Hong*, 551 S.W.3d at 893 (holding "Havey did not present any evidence allocating the hours spent on the case among specific tasks. Therefore, the trial court's attorney's fee award is not supported by legally sufficient evidence.").

Likewise, Sealey testified to an estimate of $12,500 for attorney's fees in the court of appeals and $12,500 for attorney's fees in the Supreme Court of Texas but did not provide any evidence establishing the reasonableness of these fees. He simply described it as the amount Goldberg is asking the jury to award. The evidence is legally insufficient to support the amount awarded for attorney's fees on appeal.

The proper remedy in cases where the evidence fails to satisfy the standards for determining fees under the lodestar method is to remand the issue for a redetermination of fees. *See Long*, 442 S.W.3d at 256; *Hong*, 551 S.W.3d at 893. We do so here. We sustain Sloane's second issue regarding the award of attorney's fees and reverse the trial court's judgment as to those fees. We remand for a redetermination of attorney's fees consistent with this court's opinion.

## III.    The unpaid rent award lacks sufficient evidence.

In his final issue, Sloane argues there is legally and factually insufficient evidence to establish the $1,869 in back rent. We agree.

When reviewing the jury's verdict for legal sufficiency, we view the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *Briones v. Brazos Bend Villa Apartments*, 438 S.W.3d 808, 814 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We credit evidence that supports the

verdict if reasonable jurors could, and we disregard contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827. Evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict. *Briones*, 438 S.W.3d at 814. When a party challenges the legal sufficiency of the evidence on a finding on which it did not bear the burden of proof, the party must show that no evidence supports the finding. *Id.*

An element of a claim for unpaid rent is the failure of a party to comply with an agreement to pay the rent. *See Stovall & Assocs., P.C. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 798 (Tex. App.—Dallas 2013, no pet.) (listing elements). Thus, a party seeking to recover for unpaid rent must present evidence that the rent actually remains unpaid. The only evidence offered at trial concerning the claim for rent was testimony from Davis. She answered "yes" to the question "[a]re you seeking rent since the date you filed this eviction in August through today's date in the amount of $1,869." Sloane testified that he typically paid his rent a month in advance, and that he would have paid the rent for August 2016 before July 3, 2016. There was no testimony from any source that Sloane's rent between August 2016 and the date of the trial remained unpaid.

Goldberg argues that it presented testimony from Davis that Sloane owed $1,869 in unpaid rent. The testimony from Davis, however, stated only that Goldberg was seeking rent from August 2016 to the date of trial in the amount of $1,869. She did not state that the rent was unpaid. Because Goldberg did not present evidence that the rent was unpaid, it cannot prevail on the claim for unpaid rent. We conclude the evidence is legally insufficient to support the award of $1,869 in back rent and sustain Sloane's third issue.

## CONCLUSION

Having overruled Sloane's first issue challenging the trial court's refusal to

instruct the jury on Sloane's affirmative defenses, we affirm the portion of the trial court's judgment awarding possession of the leased premises to Goldberg. Having sustained Sloane's second issue regarding the sufficiency of the evidence to support the award of attorney's fees to Goldberg, we reverse the part of the judgment awarding attorneys' fees and remand the issue to the trial court for a new trial. Having sustained Sloane's issue regarding the sufficiency of the evidence of back rent, we reverse the portion of the judgment awarding Goldberg $1,869 in back rent and render judgment that Goldberg take nothing on its claim for back rent against Sloane.

/s/    Jerry Zimmerer
Justice

Panel consists of Justices Christopher, Zimmerer, and Hassan.