**Opinion issued February 24, 2022**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00179-CV

———————————

**KANYEZI AFRICA SAFARI, INC., Appellant**

**V.**

**TAMMY SELLS, IDA BURNAMAN, AND JERRY BURNAMAN, Appellees**

---

**On Appeal from County Civil Court at Law No. 2**
**Harris County, Texas**
**Trial Court Case No. 1102079**

---

## MEMORANDUM OPINION

Following a bench trial, the trial court rendered judgment against Kanyezi Africa Safari, Inc. (Kanyezi) in favor of Tammy Sells, Ida Burnaman, and Jerry Burnaman based on their causes of action for breach of contract and violation of the

Deceptive Trade Practices Act (DTPA).[1] The trial court awarded Sells and the Burnamans a single recovery of actual damages and attorney's fees under both theories of recovery.

On appeal, Kanyezi raises eight issues.[2] Kanyezi contends that (1) the Burnamans were not consumers under the DTPA (issue one); (2) the evidence was insufficient to support the judgment under either the DTPA or breach-of-contract theories (issues two through four); (3) the trial court erred in awarding attorney's fees (issues five and six); (4) the trial court's judgment violated the one-satisfaction rule (issue seven); and (5) opposing counsel engaged in improper closing argument (issue eight).

We affirm in part, reverse in part, and remand for further proceedings.

## Background

In 2016, Tammy Sells suggested to her parents—Ida and Jerry Burnaman—that the three of them take an African safari to celebrate the Burnamans' 55th wedding anniversary and Jerry's 80th birthday. The Burnamans agreed with the suggestion, and Tammy, who worked as a flight attendant, began researching to find

---

[1]     *See* TEX. BUS. & COM. CODE §§ 17.41–.63.

[2]     We note that the issues contained in the "Issues Presented" section of Kanyezi's brief do not match exactly the order of the issues in the main headings in the body of its brief. We consider the issues in the order presented in the body of the brief.

a safari company for their trip. Tammy found information on the internet about Kanyezi, a company providing non-hunting safaris in South Africa.

Evidence at trial showed that Kanyezi was founded in 1983 by Christopher Cote. He and his son, Michael, own Kanyezi, which employed 11 people. Chris and Michael both worked for Kanyezi being responsible for Kanyezi's guest services and safety, administration, vendor relations, and for drafting advertisements and contracts for the company.

Kanyezi is licensed by the California Attorney General to sell travel services within the United States, and it has an office in California. At trial, Chris testified that he was born in California, pays taxes in California, has a California driver's license, and owns a home in Hawaii, where he spends time when he is in the United States, but he spends much of his time in Africa.

Tammy initiated contact with Kanyezi through its website, requesting information about the company and its travel services. Michael responded to Tammy's email, providing her with printed materials containing information about Kanyezi and a sample safari itinerary. Tammy and Michael also spoke on the telephone regarding Kanyezi's services and possible itineraries for the trip.

Kanyezi emailed Tammy and Ida a "Kanyezi Safari Confirmation Contract," dated December 6, 2016. The contract detailed travel, lodging, and itinerary

3

information for a safari to be provided by Kanyezi between April 9–24, 2017. Tammy, Ida, and Jerry were each listed in the contract.

As it appears in the record, the contract was nearly 50 pages long when printed. In addition to describing what was included in the travel package and stating the contract's terms and conditions, the contract contained many photographs of African animals, weather information, travel tips, and positive reviews from prior customers interspersed throughout its pages.

On the fifth page, the contract stated that the safari package price was $8,755 per person, totaling $26,265 for three people. Among the items included in the travel package, which was described as "all inclusive," were lodging, most meals, game drives to view animals, guides, and security. The package also included roundtrip, business class airfare from Houston to Johannesburg, South Africa. Ida and Jerry lived in Colorado and Tammy lived in Houston, but they planned to fly together from Houston to South Africa. The contract stated that $13,132.50—50 percent of the total price—was immediately due and that final payment was due 120 days before departure. Regarding cancellation and change fees, the contract stated that "all payments [are] nonrefundable" and provided that a $3,500 fee applied to changes made within 24 months of departure, and a fee of $7,250 applied to cancellation or change of plans within 120 days of departure.

Thirty-one pages into the contract appeared an "Estimate of Costs," with language stating, "Your expedition costs that are not included in package rate" and "not included–not prepaid." Under that language were listed certain expenses and fees, such as shopping, gratuities, park fees, taxes, and visa fees. Below the list was the total amount of $883, described as "estimated total park entry, national visa fees, shopping, extra meals, tipping, & other fees listed above per guest (final amount depends on your shopping & tipping)."

On December 7, 2016, Michael emailed Ida and Tammy, requesting passport information and attaching another document that was 20 pages long. The document contained a wide range of "travel tips," such as updated packing, public health, and weather information for South Africa. On pages 12 and 13, the document mentioned various fees that would be required, such as national park fees. Parenthetically, the document stated that the fees were "approx. $480–$840 per guest depending on tour and length" and the fees "ARE NOW PAID DIRECTLY TO KANYEZI Before Departure." And beneath the heading "NEW UPDATE!" was a statement that fees ranging from $480–$840 would be added to the final payment "per your contract."

Tammy and Ida testified at trial that, although Tammy would pay her own share of the trip, it was decided that Ida would transfer payment for all three of them to Kanyezi from her bank because she and Kanyezi had accounts with the same bank. On December 7, 2016, Ida transferred $13,132.50 to Kanyezi.

5

Michael also advised Ida to obtain travel insurance for herself and Jerry, given their ages. Ida received an email on December 9, 2016, from Kanyezi regarding the insurance. After receiving the information, Ida purchased travel insurance for herself and Jerry, costing $2,389.

Kanyezi sent Ida a second Kanyezi Safari Confirmation Contract, dated December 14, 2016. The third page reflected that Ida had paid Kanyezi $13,132.50, described as a "50% Deposit Paid as Agreed." It also stated that a "Final Payment" of $15,781.50 was "Now Due" and reflected that the $15,781.50 was calculated by adding the remaining $13,132.50 due on the safari package and an additional $2,649. The $2,649 was calculated by multiplying $883 by three. The $883 was comprised of "Contractual Prepaid [South African] & USA Government Fees & Taxes, [South African] Park Entry Fees (3), Visa fees, Road Tolls, Eco Impact Fees, Cheetah Center Fees, & All Third-Party Fees Kanyezi Is able to Prepay on Each Guest's Behalf As Itemized in Original Contract (below)." The fees were itemized 10 pages after that statement.

After she received the December 14 contract, Ida emailed Kanyezi that day. Ida wrote, "Wait! You have the amount wrong! I paid one half $13,132.50 and my understanding [is] that was 50%. I can make a direct payment into your account after you contact me with the revised amount." Kanyezi responded: "Sorry for the confusion but I think you forgot to include the contractual government taxes and

fees, airline taxes, national park entry fees for three parks, visa fees, & value added tax which is 14% in South Africa." Kanyezi told Ida that the fees "are all listed on the bottom right of your safari confirmation contract just before the wire transfer information in all contracts we send all guests to review prior to any payments." Kanyezi attached a portion of the December 14 contract stating that the final payment was $15,781.50.

The next day, Ida emailed Kanyezi indicating that she had looked at "the contract" and saw, under "estimates of costs," that it stated, "NOT INCLUDED– NOT PREPAID." But Ida acknowledged that she "[saw] the fees now" in the document that Kanyezi had sent on December 14. She sought clarification regarding whether there would be additional fees. Ida expressed concern, stating, "We are having to budget for this trip and I am getting concerned it is going to be much more than we bargain[ed] for." Kanyezi responded that there would be "[n]o other safari charges . . . other than those listed in the original contract sent prior to your 50% deposit payment."

At trial, Ida testified that she could not reach Tammy to discuss the change in the amount because Tammy was traveling as a flight attendant to Sydney, Australia. Ida testified that, because there was a deadline, and she thought that she would lose the money she had already paid, she decided to pay the amount that Kanyezi

requested. On December 15, 2016, Ida transferred an additional $15,781.50 to Kanyezi.

Two days later, Tammy returned from Sydney and emailed Kanyezi. In one email, she wrote that she was "extremely annoyed" with the way the contract was being handled. She said that she had spoken "with Michael and was told there were NO OTHER FEES except what we wished to tip and fees into the parks." She said Michael told her to bring the fees with them in cash. She did "not care" if the change in how the fees were paid was "in small print somewhere" because she spoke directly to Michael, who told her differently.

A short time later, Tammy sent another email, stating that she had just arrived from Sydney that morning and would be heading back that night. She reiterated that she was told by Kanyezi that 50 percent was required upfront and not more. Tammy stated that it felt like a "terrible bait and switch." She asked for an owner of Kanyezi to call her during certain hours.

Between December 16 and December 20, 2016, Tammy left three or four phone messages for Kanyezi. At trial, Tammy testified that the substance of her messages "was questioning why the contract changed" and asking Kanyezi "to rectify it." She acknowledged that she was "very" harsh in her first phone message and that she had used one or two curse words. She explained that the curse words were not directed at any person but at "the situation being rectified." Tammy testified

8

that she only used curse words in one of her messages. She explained that, at the time she left that message, she was sleep deprived and feeling protective of her parents who were using their savings for the trip.

On December 19 and 20, Tammy and a South African "travel specialist"—who had some affiliation with Kanyezi—exchanged emails. The travel specialist informed Tammy that her voice messages and emails had been sent to Michael and Chris, who were away on safari with guests. Tammy was also told that Chris was angry about the messages. The travel specialist said that Chris would email Tammy when he returned from safari.

Tammy emailed Chris, reiterating that Michael had told her on the phone that she and her parents should bring $883 in cash for fees and would not be required to pay the fees upfront. Tammy stated that she apologized if she had offended Chris, but she said that she did not apologize for protecting her parents. Tammy requested to have a telephone conversation with Chris.

Tammy testified that, from December 20, 2016 until January 5, 2017, no one from Kanyezi called her. Neither she nor Ida had any communication with Kanyezi during that period. She also testified that she left no phone messages for Kanyezi during that period. However, at trial, Chris claimed differently, testifying that Tammy continued to leave offensive messages during that time.

On January 5, 2017, Tammy sent a message to K. Peterson, who had posted an online review for Kanyezi. Tammy told Peterson that she had "booked with" Kanyezi and that "the agreement change[d] as the second half of the money was to be wired." Tammy explained that they had paid Kanyezi, but Kanyezi had not returned her phone calls for three weeks. Tammy told Peterson that she wanted "to find someone who has in fact been on a safari" with them, who could "tell [her] what kind of company they are." Tammy posted similar statements about Kanyezi on an online travel forum. She again asked if anyone had information about the company.

Tammy also spoke with Michael on the phone that day. Tammy testified that Michael told her that he could not answer any of her questions. She stated that the tone of the conversation was different than the previous calls she had with Michael, but she did not think there was anything "rude or impolite on either side" of the conversation.

Kanyezi sent an email to Tammy dated January 5, 2017, informing her that it was "attempting cancellation" of the "non-refundable airfare" and other services that it had "contracted to undertake on your behalf in Africa." Kanyezi stated that it would communicate in writing "regarding the final disposition of your written contract." Tammy forwarded the email to Ida, who emailed Kanyezi. Ida told Kanyezi that they did not want cancellation because they "could not afford to cancel unless you refund everything including the insurance money you wanted us to take

10

out." Ida said that she thought there was a "communication problem" and that they "really need[ed] to talk."

An hour later, Ida sent another email stating, "You have my money and I have a contract which I, nor Tammy, have not asked to cancel." Ida asked, "Where in the contract does it say you can cancel on me?" She said that she was "very concerned" that Kanyezi had not returned her calls" and asked Kanyezi to call her. An hour later, Ida sent a third email directed to Michael in which she asked him to call her and told him that they were "taking a lot of our savings to do this trip." She explained that was the reason Tammy asked questions and that Tammy was worried for her parents.

A short time later, Kanyezi responded in a lengthy email, informing Ida that it was cancelling the trip. Kanyezi did not state that it was refunding the money that it had received from Ida for the trip. Instead, Kanyezi represented that it was attempting to obtain funds back "from airline suppliers and other hotel and ground vendors that make up the many components of your safari expedition reserved with us under written contract."

Kanyezi stated that it had not returned Tammy's phone messages at the times she had requested because of the time-zone differences between the United States and South Africa. Kanyezi also asserted that Tammy was never told that the fees above the cost of the safari package should be brought to Africa in cash and not prepaid. It stated that the information was sent in writing regarding prepayment of

11

the fees before any money was paid. Kanyezi claimed that it had never previously been accused of dishonesty.

Kanyezi informed Ida: "[W]e believe now it [is] best you seek out another safari operator." Kanyezi again stated that it would attempt to obtain money back that it had paid to third-party vendors, but it did not state that it would refund all the money it had been paid under the contract. Kanyezi said all future communication would be by email.

Ida responded that day, asking Kanyezi not to cancel the trip because they were "of modest means" and would "not be able to make the trip after losing money." Ida said that there had been miscommunication about the price of the package, which was why Tammy sought reassurance about the contract price.

At trial, Chris testified that he had then spoken with Ida on the telephone and had agreed to go forward with providing the trip. However, Ida testified that there was no such telephone conversation with Chris, nor did she hear back from Kanyezi by email regarding retraction of the cancellation.

On January 13, 2017, Chris sent an email to Ida informing her that Kanyezi had been alerted to Tammy's January 5 posting on an online travel forum in which Tammy stated that Kanyezi had been paid the "the entire amount asked for even though they had changed the agreement before the second half [of the payment] was due." Tammy had posted that she could not "get anyone to communicate with [her]

12

in almost three weeks" and that [n]o one seems to answer the phone now." She asked if anyone had information that they could share about Kanyezi.

Chris claimed in his email to Ida that the online posting was "libelous" and had cost Kanyezi money because of lost business. Chris said that he had contacted his attorney and "will deal with this legally now." He closed the email by stating, "You will each be hearing from our attorney as quickly as we can organize a lawsuit."

Ida sent an email to Chris in which she again said that she thought it had all arisen from "a miscommunication due to lack of contact." She asked Chris, "Do you really want to hurt us by taking our savings?" Ida also told Chris that she thought Kanyezi "should return our $28,914 which we understood bought your product, the safari trip. Since you canceled the trip, you should return the money and the over $2000 we spent on insurance that Michael insisted we needed." Kanyezi did not respond to Ida's email.

Tammy also corresponded with Chris regarding his email. Chris ended his correspondence with Tammy by stating, "See you in court." And Tammy told Chris that she had already contacted her attorney.

Tammy and her parents retained an attorney, Kenneth Baird. On February 15, 2017, Baird mailed a demand letter to Michael at Kanyezi's California office. The letter stated that Baird had been retained regarding Tammy's and the Burnamans'

breach-of-contract and DTPA claims against Kanyezi. The letter stated that Kanyezi had "violated the DTPA by falsely advertising its services and taking advantage of [Tammy] and her parents to a grossly unfair degree." The letter also "advised that by unilaterally cancelling the contract without justification, Kanyezi Africa Safaris has committed a material breach of contract." The letter requested "an immediate refund of the $28,914 which has been paid by our clients." The letter warned that if Kanyezi did not refund that amount within 30 days, Tammy and the Burnamans would file suit in Harris County to recover damages.

On March 6, 2017, Kanyezi sent an email to Ida and Tammy that contained ticketing information for flights booked for April 9, 2017, from Montreal to Johannesburg for Tammy and the Burnamans. At trial, Ida testified that before the March 6 email, they had not heard from Kanyezi other than receiving what she perceived as automatically generated emailed advertisements—that she described as "stock stuff"—that did not address their trip or retract Kanyezi's cancellation.

The March 6 email received by Ida and Tammy with the Montreal to Johannesburg flight information asked them to respond to Kanyezi by the next day, March 7, to inform Kanyezi whether they all would leave from Houston or whether the Burnamans would leave from Denver and Tammy from Houston. The email also stated that, "[c]ompliments of Kanyezi Safari ownership," they would receive upgrades to their safari package and additional amenities.

14

On March 6, attorney Baird emailed Kanyezi, asking questions about the email containing the flight and trip information. Baird attached the February 15 demand letter that he had sent to Kanyezi. Kanyezi did not respond to Baird's email. Tammy told Ida to call the airlines to check on the tickets. When she called, Ida discovered that Kanyezi had canceled the tickets on March 8.

Kanyezi sent Ida a check for $18,414, which was over $10,000 less than the amount paid to Kanyezi. The check was dated March 13, 2017. In the memo, Kanyezi wrote, "April 2017 Non Refundable Contract." Beneath that was written, "Full Final Refund." On April 10, 2017, Ida mailed the check back to Kanyezi at its California address.

On November 28, 2017, Tammy and her parents (hereafter, referred to as Appellees) filed suit against Kanyezi, Chris, and Michael. Chris and Michael filed special appearances and were dismissed from the suit based on lack of personal jurisdiction. Appellees amended their petition, asserting causes of action against only Kanyezi for breach of contract, violation of the DTPA, common-law fraud, conversion, and violation of the Texas Theft Liability Act.[3] Baird filed a motion to withdraw as Appellees' counsel in June 2019. In September 2019, Jon Hill appeared as Appellees' new counsel.

---

[3] *See* TEX. CIV. PRAC. & REM. CODE §§ 134.001–.005.

On September 23, 2020, the trial court rendered summary judgment in favor of Kanyezi on Appellees' Theft Liability Act and conversion claims. As the prevailing party on the Theft Liability Act claim, Kanyezi was entitled to its "reasonable and necessary attorney's fees." *See* TEX. CIV. PRAC. & REM. CODE § 134.005(b); *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 148 (Tex. 2019) (holding that defendant "prevailed" under Theft Liability Act when it obtained summary judgment on plaintiff's Theft Liability Act claim, entitling it to attorney's fees for defending against claim).

On November 6–7, 2019, the case was tried to the bench on Appellees' claims of common-law fraud, violation of the DTPA, and breach of contract. Ida and Tammy testified for Appellees, and Chris testified for Kanyezi. Included in the parties' evidence were the December 6 and December 14, 2016 contracts, the emails exchanged between the parties, and Baird's demand letter. During trial, the parties agreed that the issue of attorney's fees would be determined by submission after a determination of liability and damages.

On November 7, 2020, the trial court rendered an interlocutory judgment in favor of Appellees on their breach-of-contract and DTPA claims but determined that Appellees were not entitled to recover on their common-law fraud claim. The trial court determined that Appellees were entitled to actual damages of $28,914 with attorney's fees yet to be determined.

The parties filed affidavits, billing records, other evidence, and briefing to support their respective attorney's fees. On November 18, 2019, the trial conducted a hearing on the issue of attorney's fees.

On November 22, 2019, the trial court signed a "Final Judgment." Kanyezi timely filed a motion for new trial and a motion to modify, extending the trial court's plenary power. *See* TEX. R. CIV. P. 329b. Because no order on the motions was signed, the motions were overruled by operation of law on February 5, 2020. *See* TEX. R. CIV. P. 329b(c) (motion for new trial or motion to modify overruled by operation of law 75 days after judgment signed if not determined by written order).

The trial court conducted a hearing on the post-judgment motions on February 18, 2020, during which it orally overruled Kanyezi's post-judgment arguments made in its motion. At the hearing, the parties agreed that the Final Judgment had not been properly structured with respect to damages and attorney's fees. On February 27, 2020—within 30 days after Kanyezi's post-judgment motions were overruled—the trial court signed a "Final Judgment–Clarified," which is the final judgment in this case. *See* TEX. R. CIV. P. 329b(e) (plenary power extended until 30 days after timely filed motion for new trial or motion to modify motions overruled).

The trial court rendered judgment for Appellees and against Kanyezi based on breach of contract and violations of the DTPA, awarding actual damages of $28,914—the total amount of money Appellees paid to Kanyezi—plus prejudgment

17

interest. The trial court also awarded Appellees attorney's fees of $25,182.61. The judgment reflects that the trial court found that Appellees "were entitled to attorney's fees in the amount of $27,682.61, but that [Kanyezi was] entitled to an offset amount for attorney's fees incurred in the defense of the Texas Theft Liability Claim as the prevailing party in the amount of $2,500.00." The next day, the trial court issued findings of fact and conclusions of law.

Kanyezi appealed. It raises eight issues in which it challenges the trial court's liability findings and award of attorney's fees.

### One-Satisfaction Rule

Because it aids in understanding other issues, we begin with Kanyezi's seventh issue in which it contends that the trial court's final judgment should be modified because it violates the one-satisfaction rule and impermissibly allowed a double recovery of damages. Under the one-satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered because of a particular injury. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006). A double recovery occurs when a judgment awards a plaintiff more than one recovery for the same injury. *Halliburton Energy Servs., Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 263 (Tex. App.—Dallas 2014, no pet.) (citing *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998)). "A party may seek damages based on alternative theories, but it is not entitled to a double recovery." *TMRJ*

18

*Holdings, Inc. v. Inhance Techs., LLC*, 540 S.W.3d 202, 208 (Tex. App.—Houston [1st Dist.] 2018, no pet.). But, if a party receives favorable findings on two or more theories of recovery that are consistent with each other and result in the same damages, then the trial court may render judgment awarding a single recovery of these damages, and the judgment may be based on all of the theories. *Hatfield v. Solomon*, 316 S.W.3d 50, 59 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Here, the trial court determined that Appellees were entitled to recover under two theories of recovery: breach of contract and violation of the DTPA. Those two theories of recovery are consistent with each other and resulted in identical damages and attorney's fees. In its "Final Judgment"—signed on November 22, 2019—the trial court separately awarded the same amount of actual damages and attorney's fees under each of theory of recovery, making it appear that Appellees were entitled to recover damages twice—once for breach of contract and once for violation of the DTPA. Kanyezi objected in its combined motion for new trial and motion to modify that the judgment awarded an impermissible double recovery. At the hearing on the combined motion, Kanyezi raised the objection and requested that Appellees elect whether they recover under breach of contract or violation of the DTPA. Appellees stated that they would elect recovery under the DTPA. Kanyezi asked the trial court to modify the judgment to reflect only recovery under the DTPA. The trial court denied the request for modification.

19

Later in the hearing, a discussion ensued in which the trial court and the parties agreed that the judgment needed to be clarified to reflect that, although the trial court found in favor of Appellees on two theories of recovery, Appellees were entitled only to single recovery of damages and attorney's fees. On February 27, 2020, the trial court signed its "Final Judgment–Clarified." That judgment reflects that the trial court found in favor of Appellees on both breach of contract and violation of the DTPA but awarded only a single recovery of damages and attorney's fees. In its findings of fact and conclusions of law, the trial court concluded: "Plaintiffs are not required to elect remedies because the amount recovered . . . under both theories and causes of action are the same."

On appeal, Kanyezi asserts that the trial court's judgment should be modified to reflect that Appellees elected to recover on its DTPA claim. However, Appellees made that election before the parties and the trial court realized that the judgment should be restructured to award Appellees a single recovery of damages and attorney's fees under the two theories of recovery on which Appellees prevailed. The trial court had then signed a new judgment reflecting a single recovery of damages and attorney's fees. Because the damages and attorney's fees recoverable under the breach-of-contract and DTPA theories are identical and because the trial court awarded a single recovery of damages, Appellees were not required to elect between these theories of recovery. *See Alief Indep. Sch. Dist. v. Perry*, 440 S.W.3d

20

228, 245 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *Hatfield*, 316 S.W.3d at 59. Therefore, we reject Kanyezi's argument that the trial court's final judgment requires modification.

We overrule Kanyezi's seventh issue.

## Breach of Contract

In its fourth issue, Kanyezi contends that "the trial court erred in holding Kanyezi breached the contract." But before we discuss the merits of this issue, we address Kanyezi's contention that Tammy did not have standing to bring a breach of contract claim.

## A.     Standing

### 1.     *Legal Principles*

A party's standing to seek relief is a question of law we review de novo. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004). The standing doctrine requires (1) a real controversy between the parties that (2) will actually be determined by the judicial declaration sought. *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005); *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001). "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a justiciable interest in its outcome." *See Lovato*, 171 S.W.3d at 848 (internal quotation marks omitted). A plaintiff has standing when she is personally aggrieved, regardless of whether she is acting with

legal authority. *Nootsie*, *Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996).

To establish standing to assert a breach of contract claim, a party must prove her privity to the agreement, or that she is a third-party beneficiary. *Foster v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00253-CV, 2018 WL 1095760, at *7 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.) (citing *OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 738 (Tex. App.—Dallas 2007, pet. denied)). For standing purposes, privity is established if the plaintiff proves that the defendant was a party to an enforceable contract with the plaintiff. *Id.* In short, "[a] party to a contract has standing to maintain a suit on the contract." *Am. Heritage, Inc. v. Nevada Gold & Casino, Inc.*, 259 S.W.3d 816, 820 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Interstate Contracting Corp. v. City of Dall.*, 135 S.W.3d 605, 618 (Tex. 2004)).

### 2.    *Analysis*

Kanyezi asserts that Tammy does not have standing because "the Contract was between Kanyezi and Ida and was created on December 7, 2016, when Ida paid $13,132.50 to Kanyezi." Kanyezi points out that, on that date, Tammy was traveling to Australia for work and that, after the contract's creation, Kanyezi did not discuss the contract with her until December 17. It also claims that "Tammy paid no consideration whatsoever to Kanyezi."

22

To resolve whether a plaintiff has standing, we look to the facts alleged in the petition, but we may consider other evidence in the record if necessary. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). The standing inquiry "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 153 (Tex. 2012).

Here, Tammy and her parents alleged in their amended petition that all three of them "entered into a valid and enforceable contract" with Kanyezi. They claimed that they and Kanyezi "agreed for Defendant Kanyezi to provide three safaris to [Tammy and her parents] for a fixed price of $26,265 to be paid in two equal installment payments." They alleged that they "fulfilled all of their obligations under the contract" by "remitt[ing] the agreed fifty percent deposit" and that later Kanyezi "received the full purchase price" from them.

The evidence showed that Tammy engaged in the upfront negotiations with Kanyezi about the terms of the contract. The contract was emailed to both Tammy and Ida on December 7, 2016. Tammy and her parents are separately named and listed in the contract received on December 6 and then again in the contract received on December 14. The contract is clear that each are receiving travel services from Kanyezi.

Ida and Tammy testified that Tammy paid her share of the trip, but they decided that payment would be made from Ida's account because Kanyezi's bank account was with Ida's bank, making transfer easier. After payment was made, Kanyezi continued to communicate with Tammy about the contract. The evidence also showed that Kanyezi considered Tammy a party to the contract. In Chris's January 13, 2017 email to Ida—in which he indicated that he planned to sue Appellees for allegedly damaging his business—Chris reminds Ida, "Your daughter [Tammy] made an agreement contractually."

We conclude that the allegations in the amended petition and the evidence sufficiently showed that Tammy was a party to the contract. Thus, we hold that Tammy had standing to assert a breach-of-contract claim against Kanyezi.

## B. Sufficiency of the Evidence

The essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained resulting from the breach. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Kanyezi asserts that the evidence was legally and factually insufficient to support a determination that it breached the contract. In their amended petition, Appellees alleged that Kanyezi breached the contract when it "unilaterally" cancelled it.

24

Relevant to the breach, the trial court's findings of fact and conclusions of law included the following:

- Kanyezi "unilaterally breached the contract . . . in January 2017," representing that "the contract was terminated."

- Kanyezi "indicated that the safari contract was cancelled."

- Kanyezi's "silence regarding a refund indicated [its] intent to keep all funds paid by [Appellees] without providing the services promised."

- Kanyezi "did not respond to [Appellees'] request for reinstatement of the safari, refund of all amounts paid, or any other inquiry regarding the status of the safari trip between January 13, 2017 and March 6, 2017."

- Kanyezi sent "some emails . . . regarding aesthetic considerations of activities going on at the safari location," but "the Court finds these were automated and not specifically directed at the contractual issues or inquiries between the parties. As such, they do not repudiate the actuality of [Kanyezi's] silence and non-responsiveness toward [Appellees] between January 13, 2017 and March 6, 2017."

- Kanyezi "broke the agreement between the parties."

## C.     Standard of Review

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Nguyen v. Yovan*, 317 S.W.3d 261, 269-70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). When the appellate record contains a reporter's record, findings of fact on disputed issues are not conclusive and may be challenged for the sufficiency of the evidence. *See Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003). We review the trial court's findings of fact under the same sufficiency of the

evidence standard used to determine whether sufficient evidence exists to support a jury finding. *See Catalina*, 881 S.W.2d at 297; *Nguyen*, 317 S.W.3d at 269–70.

When considering whether legally sufficient evidence supports a challenged finding, we must consider the evidence that favors the finding if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the trial court's finding and indulge every reasonable inference to support it. *Id.* at 822. Because it acts as the fact finder in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). If the evidence at trial "would enable reasonable and fair minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822.

In a factual sufficiency review, we consider and weigh all the evidence. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When a party challenges the factual sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.*

26

A party may not challenge the trial court's conclusions of law for factual sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). In an appeal from a bench trial, we review a trial court's conclusions of law de novo, affirming the judgment on any legal theory that finds support in the evidence. *Id.*

**D.  Analysis**

The trial court's findings indicate that the court determined that Kanyezi breached the contract in January 2017 by representing to Appellees that the contract was "cancelled" and "terminated" before Kanyezi's performance under the contract was due. We conclude that the trial court's finding that Kanyezi breached the contract has support in the law and in the record.

"A breach [of contract] occurs when a party fails or refuses to do something [it] has promised to do." *Markovsky v. Kirby Tower*, *L.P.*, No. 01-13-00516-CV, 2015 WL 8942528, at *3 (Tex. App.—Houston [1st Dist.] Dec. 15, 2015, no pet.) (mem. op.). "Repudiation or anticipatory breach is a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance." *CMA-CGM (Am.), Inc. v. Empire Truck Lines, Inc.*, 416 S.W.3d 495, 519 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). "It is conduct that shows a fixed intention to abandon, renounce, and refuse to perform the

27

contract." *Id.* (citing *In re Braddock*, 64 S.W.3d 581, 585 (Tex. App.—Texarkana 2001, no pet.)).

Here, the evidence showed that, on January 5, 2017, Kanyezi informed Ida that it was cancelling Appellees' trip and would not be providing the contracted-for safari services for which Appellees had already paid in full. Kanyezi told Ida that it "believe[d] now it [is] best you seek out another safari operator." Even though it had unilaterally decided to cancel, Kanyezi did not offer to return Appellees' funds but instead indicated that it would return what funds it could recover from third-party vendors. By informing Ida that it was not providing the safari services, and that Appellees would need to find another safari operator, Kanyezi repudiated the contract. *See id.*

Ida emailed Kanyezi stating that, because she did not want to lose any money, she did not want the trip canceled. But Kanyezi did not respond to Ida's email by retracting the repudiation. *See Tubb v. Aspect Int'l, Inc.*, No. 12-14-00323-CV, 2017 WL 192919, at *3 (Tex. App.—Tyler Jan. 18, 2017, pet. denied) (mem. op.) ("[T]he defendant can assert that it timely retracted its own repudiation by notifying the plaintiff that it intended to perform."). Instead, the evidence supported a reasonable inference by the trial court that Kanyezi reaffirmed and reasserted its repudiation of the contract by Chris's January 13, 2017 communications. Chris emailed Ida informing her that he was contacting his attorney and intended to sue Appellees for

defamation. That same day, Chris's last message to Tammy was "see you in court," thereby confirming Kanyezi's repudiation. *See Group Life & Health Ins. Co. v. Turner*, 620 S.W.2d 670, 673 (Tex. Civ. App.—Dallas 1981, no writ) ("Repudiation consists in such words or actions by a contracting party as indicate that he is not going to perform his contract in the future." (internal quotation marks omitted)).

As the Supreme Court of Texas explained, "We have long recognized the rule of anticipatory breach: the repudiation of a contract before the time of performance has arrived amounts to a tender of breach of the entire contract and allows the injured party to immediately pursue an action for damages." *Murray v. Crest Const., Inc.*, 900 S.W.2d 342, 344 (Tex. 1995) (citing *Pollack v. Pollack*, 46 S.W.2d 292, 293 (Tex. Comm'n App. 1932)). By its conduct, Kanyezi repudiated the contract, tendering breach of the contract. In response to Chris's January 13 communication, Ida emailed him that same day. She informed Chris that Kanyezi "should return our $28,914 which we understood bought your product, the safari trip. Since you canceled the trip, you should return the money and the over $2000 we spent on insurance that Michael insisted we needed." By her email, Ida accepted Kanyezi's tender of the breach, making Kanyezi's repudiation an anticipatory breach. *See Pollack*, 46 S.W.2d at 293 ("[I]f [tender of breach] is accepted by the other party, it constitutes what is known in law as an anticipatory breach of such contract as a whole, and in such event the injured party is at liberty to at once demand his damages

29

for such breach, and, if necessary, begin an action therefor."). Appellees reaffirmed the acceptance of the breach when their attorney sent their demand letter to Kanyezi on February 15, 2017.

On appeal, Kanyezi asserts that the "overwhelming evidence established Kanyezi performed as required under the Contract and fully intended to take Appellees on safari, all the way through its cancellation of the tickets on March 8, 2017." Kanyezi claims that Appellees breached the contract when they sent the February 15 demand letter. Kanyezi's assertion that it "performed as required" primarily hinges on Chris's testimony that, soon after Kanyezi's January 5 email cancelling the contract, he had a telephone conversation with Ida in which he agreed that Kanyezi would provide Appellees with the contracted-for travel services. However, Ida testified that the telephone conversation never occurred, and she confirmed that Kanyezi did not correspond with Appellees specifically about the contracted-for services until March 6, when Kanyezi emailed the flight information. The trial court's findings of fact indicate that it believed Ida's testimony on this point. And, because it was the fact finder, it was entitled to do so. *See Wise v. Conklin*, No. 01-13-00840-CV, 2015 WL 1778612, at *3 (Tex. App.—Houston [1st Dist.] Apr. 16, 2015, no pet.) (mem. op.) ("In a bench trial, the trial court is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary.").

30

Kanyezi also contends that evidence showed that it had intended to perform the contract because it "continued to send updates to Appellees as it would to any other guests." Related to this contention, the trial court found:

> [Kanyezi] did cause some emails to be sent regarding aesthetic considerations of activities going on at the safari location. However, the Court finds these were automated and not specifically directed at the contractual issues or inquiries between the parties. As such, they do not repudiate the actuality of [Kanyezi's] silence and non-responsiveness toward Plaintiffs between January 13, 2017 and March 6, 2017.

The finding was supported by Ida's testimony in which she stated that before the March 6 email, Appellees had not heard from Kanyezi other than receiving what she perceived as automatically generated, emailed advertisements—that she described as "stock stuff"—which did not address their trip or retract Kanyezi's cancellation. Thus, the trial court's finding regarding the emails was a reasonable inference from the evidence and refuted Kanyezi's contention that the emails showed that it intended to perform the contract. In any event, these emails were sent after Kanyezi's repudiation and anticipatory breach of the contract, as discussed.

Kanyezi also points to an email it received from Ida on January 28, 2017, in which she inquired, "Since I have not received my money back, does that mean the trip is still on?" She provided updated passport information "in case it was." Kanyezi contends that Ida believed that the trip was proceeding and that this supports its contention that Kanyezi intended to perform the contract. However, at that time, Kanyezi had already repudiated the contract, and Ida had requested the return of the

31

funds. Moreover, Kanyezi did not respond to the email or indicate any desire to revive the repudiated contract.

In addition, on February 15, 2017, Appellees' attorney, Baird, sent a demand letter to Kanyezi, specifically addressed to Michael, at Kanyezi's California address. Chris testified that he was not aware of the demand letter until March 6, when he received Baird's email responding to Kanyezi's March 6 email and attaching the February 15 letter. However, because it was the fact finder, the trial court could have disbelieved Chris's testimony. The evidence also showed that the letter was mailed to Michael by certified and regular mail. While the evidence showed that the certified letter was not received, the trial court could have reasonably inferred that the letter sent by regular mail was received by Kanyezi through Michael.

We hold that the evidence was legally and factually sufficient to support the trial court's finding that Kanyezi breached the contract. We overrule Kanyezi's fourth issue. Because the judgment can be upheld on Appellees' breach-of-contract claim, we need not address Kanyezi's first three issues, which challenge the trial court's finding of liability in favor of Appellees on their DTPA claim. *See U.S. Ply, Inc. v. ARCI, Ltd.*, No. 09-17-00128-CV, 2019 WL 1830680, at *8 (Tex. App.— Beaumont Apr. 25, 2019, no pet.) (mem. op.) ("Because we have found the record supports the trial court's verdict on ARCI's breach of express warranty claims, we need not address whether the evidence also supports the judgment on its breach of

implied warranty and DTPA claims."); *Robinson v. Ochoa*, No. 13-16-00357-CV, 2018 WL 1633516, at *5 (Tex. App.—Corpus Christi Apr. 5, 2018, pet. denied) (mem. op.) (concluding it was unnecessary to address appellant's issues regarding appellees' causes of action for fraud, conversion, promissory estoppel, money had and received, and violations of DTPA because evidence supported judgment on breach of contract theory of recovery); *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 870 (Tex. App.—Dallas 2008, no pet.) ("When the judgment rests on multiple theories of recovery, we need not address all causes of action if any one theory is valid."); *see also* TEX. R. APP. P. 47.1 (providing that opinion must be "brief as practicable" but address every issued "raised and necessary to final disposition of the appeal").

## Closing Argument

The record shows that Kanyezi has sued Ida and Tammy in Harris County district court related to postings they have made on the internet regarding the parties' dispute. In its eighth issue, Kanyezi contends that "Appellees' improper closing argument"—which referred to the district court litigation—"requires a new trial." Specifically, Kanyezi points to the following portion of the argument made by Appellees' attorney:

> My clients in any judgment that this Court might grant need three things: They need their trip money back; they need a judgment that ends all the ongoing litigation, specifically we got this and collateral defamation action. My clients don't deserve to spend their last years in

ongoing circular litigation so that is really a goal of something we are trying to accomplish here today a judgment of whatever type it is that ends this litigation. So, I mean, you've seen the posts my clients made. You got to see it later ones [sic]. They posted the truth. My clients need a judgment that shows that. And that also defeats the collateral defamation action that's going on. I can't guarantee that they are not going to continue to sue, but if we have a finding that they did commit a Deceptive Trade Act or fraud then that's really going to do damage to that case going on any further.

In its closing argument, Kanyezi responded, "[I]t's surprising to me that plaintiff's counsel is arguing that this Court can make a ruling that would have some kind of an impact on litigation that's not before this Court. That's not reasonable and that's not the law, and furthermore, that's not the facts of this case." Kanyezi then explained that it had attempted to transfer the instant case to district court and consolidate the cases, but Appellees had opposed the transfer. Kanyezi argued, "So for plaintiffs to take the position at this point that this Court is supposed to take some sort of action in this proceeding that will have an impact on a proceeding that plaintiffs opposed joining is not reasonable and is inconsistent with their prior position."

After the parties finished their closing arguments, the trial court addressed the parties. In its brief, Kanyezi focuses on the following comment by the trial court: "You know, there is discussion about what's going on in another court and, you know, I would like to see y'all have finality and go about your lives without this hanging over you." Regarding this comment, Kanyezi asserts in its brief: "Thus, on

34

the record, the trial court evidenced [its] clear intent to render judgment so as to interfere with the jurisdiction of another court and impact the trial of claims and evidence not before him. This was blatantly improper." Kanyezi then argues, "Appellees' counsel's improper argument was intended to, and did, cause the Court to render the improper judgment. . . ."

Although presented as an issue about improper closing argument, the gravamen of Kanyezi's complaint is that the trial court acted improperly at the request of Appellees' counsel. We are mindful that, "[i]n the absence of a clear showing to the contrary, we will presume the trial court was a neutral and detached officer." *Manigault v. Thorn-Henderson*, No. 12-14-00156-CV, 2016 WL 786865, at *3 (Tex. App.—Tyler Feb. 29, 2016, no pet.) (mem. op.). The complaining party must show the judge acted improperly and that it suffered probable prejudice as a result. *Rymer v. Lewis*, 206 S.W.3d 732, 735–36 (Tex. App.—Dallas 2006, no pet.). In analyzing this issue, we examine the entire record. *See id.* at 736. Further, we note that because it was the trier of fact, the trial court was fully capable of disregarding improper argument. *See Lopez v. State*, 725 S.W.2d 487, 490 (Tex. App.—Corpus Christi 1987, no pet.) ("[T]he trial court was sitting as trier of fact and was quite capable of disregarding any improper argument, and will be presumed to have done so.")

In citing the trial court's complained-of comment, Kanyezi takes the comment out of context. Here is the context in which the complained-of comment (in italics) was made:

> I would encourage you all to talk. *You know, there is discussion about what's going on in another court and, you know, I would like to see y'all have finality and go about your lives without this hanging over you.* And so I'd like to give you an opportunity. I'm going to rule tomorrow morning. I would like to give you an opportunity to see if you would like to go mediate. I don't know if you've mediated that other case.

(Emphasis added.) Kanyezi's counsel then informed the trial court that they had been to mediation.

When viewed in context, the record shows that the trial court made the complained-of comment in discussing possible mediation with the parties. The comment, when read in context, does not evidence a "clear intent" by the trial court "to render judgment so as to interfere with the jurisdiction of another court and impact the trial of claims and evidence not before [it]," as Kanyezi claims on appeal. Thus, Kanyezi's conclusion—that "Appellees' counsel's improper argument was intended to, and did, cause the Court to render the improper judgment"—is also without merit.

We overrule Kanyezi's eighth issue.

**Attorney's Fees**

In its final judgment, the trial court awarded Appellees $25,182.61 in attorney's fees. The trial court found that Appellees were entitled to attorney's fees of $27,682.61 but that Kanyezi was "entitled to an offset amount for attorney's fees incurred in the defense of the Texas Theft Liability Claim as the prevailing party in the amount of $2,500.00." In its fifth issue, Kanyezi challenges the trial court's finding that Appellees were entitled to $27,682.61 in fees. In its sixth issue, Kanyezi contends that it was entitled to more than a $2,500 offset for its attorney's fees incurred in successfully defending against Appellees' Theft Liability Act claim.

**A.    Standard of Review**

An award of attorney's fees must be supported by evidence that the fees are reasonable and necessary. *State Farm Lloyds v. Hanson*, 500 S.W.3d 84, 97 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991)). We review the question of whether a trial court's award of attorney's fees is reasonable and necessary for an abuse of discretion. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997). Evidentiary sufficiency issues are not independent grounds under this standard, but the sufficiency of the evidence is a relevant factor in assessing whether

the trial court abused its discretion. *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 486 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

## B.     Legal Principles

The fees in this case were presented under the lodestar method, which applies when the claimant puts on evidence of reasonable fees by relating the hours worked multiplied by hourly rates for a total fee. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 495–96 (Tex. 2019). "Under the lodestar method, the determination of what constitutes a reasonable attorney's fee involves two steps." *El Apple I*, 370 S.W.3d at 760. In the first step, "the court must determine the reasonable hours spent by counsel in the case and a reasonable hourly rate for such work." *Id.* "The court then multiplies the number of such hours by the applicable rate, the product of which is the base fee or lodestar." *Id.* It is the fee claimant's burden to provide sufficient evidence to meet the first step. *Rohrmoos Venture*, 578 S.W.3d at 498. There is a presumption that the base lodestar calculation, when supported by sufficient evidence, reflects the reasonable and necessary attorney's fees that can be shifted to the non-prevailing party. *Id.* at 499.

In the second step, the court may adjust the base lodestar up or down if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case. *Id.* at 494. The second step permits the factfinder to determine whether evidence of other considerations overcomes the presumption of reasonableness. *Id.*

38

at 501. If the opponent of the fee seeks a reduction, "it bears the burden of providing specific evidence to overcome the presumptive reasonableness of the base lodestar figure." *Id.*

## C.  Analysis

In the trial court, Appellees requested attorney's fees of $27,682.61. They supported the requested fees with the affidavit and billing records of their current attorney, Jon Hill, and with the affidavit of their former attorney, Kenneth Baird. A portion of Baird's fees were supported by billing records, but the greater amount were for "unbilled work." Among its arguments on appeal, Kanyezi asserts that Appellees did not meet their burden in the first step of the lodestar analysis because they failed to provide evidence of the time Baird spent on the specific tasks he performed for the unbilled work.

Under the first step, sufficient evidence of the attorney's fees sought includes, at a minimum, evidence of (1) the particular services performed; (2) who performed those services; (3) approximately when the services were performed; (4) the reasonable amount of time required to perform the services; and (5) the reasonable hourly rate for each person performing such services. *Id.* at 502. Contemporaneous billing records are not required to prove that the requested fees are reasonable. *Id.* But "[g]eneral, conclusory testimony devoid of any real substance will not support a fee award." *Id.* at 501. Generalities about tasks performed provide insufficient

39

information for the factfinder to meaningfully review whether the tasks and hours were reasonable and necessary. *See El Apple I*, 370 S.W.3d at 763. There must be some evidence to inform the trial court of the time spent on specific tasks to enable the factfinder to meaningfully review the requested fees. *See Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014); *City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) ("In *El Apple*, we said that a lodestar calculation requires certain basic proof, including itemizing specific tasks, the time required for those tasks, and the rate charged by the person performing the work.").

In his affidavit, Baird stated that he charged $150 per hour for his services in this case. He testified that a portion of his fees—$7,680—was for "unbilled work."[4] With respect to the unbilled work, Baird testified as follows:

> I have unbilled work in progress of 51.2 hours or $7,680. This includes three extensive and lengthy responses to [Kanyezi's] motions for summary judgment, defending the depositions of all three [Appellees] with two of the depositions approaching the six hour limit, attending an oral hearing on a motion for continuance, and attending mediation.

While he testified that he spent a total of 51.2 hours on the listed tasks, Baird presented no testimony or documentary evidence itemizing or otherwise allocating

---

[4]     Baird also testified that he had billed Appellees $4,865.68 for other legal services. He attached billing records for those services. In a "Post-Trial Motion for Attorney's Fees," Appellees stated that, after adjustment for fee segregation, they were seeking to recover $6,144 of the $7,680 for unbilled work and $4,406.11 of the $4,865.68 for billed work, totaling $10,550.11 for Baird's services.

the amount of time he spent on a particular task. Appellees did not provide any additional documentation or evidence to support the $7,680 fee.

We conclude that, without any evidence of the time spent on specific tasks, the trial court had insufficient information to meaningfully review the fees requested for Baird's unbilled work. *See Rohrmoos Venture*, 578 S.W.3d at 505; *Long*, 442 S.W.3d at 255; *El Apple*, 370 S.W.3d at 764. The trial court could not have determined whether the time spent on each task was reasonable, the charges were inadequately documented, or whether the tasks performed were duplicative or unnecessary. *See El Apple I*, 370 S.W.3d at 762 ("Charges for duplicative, excessive, or inadequately documented work should be excluded."). We hold that the evidence was not legally sufficient to support the trial court's finding that Appellees were entitled to recover their requested fees of $27,682.61, from which the court then determined its ultimate fee award of $25,182.61 after subtracting $2,500 for the offset of Kanyezi's attorney's fees. *See Rohrmoos Venture*, 578 S.W.3d at 505; *Long*, 442 S.W.3d at 255; *see also Advanced Tech. Transfer & Intellectual Prop. Group LLC v. Krenek*, 627 S.W.3d 540, 547 (Tex. App.—Houston [14th Dist.] 2021, no pet.) ("Because the record does not detail the particular services performed for 34.25 of the 54.25 hours worked by attorney Krenek, we conclude the evidence is legally insufficient to support the full award of attorney's fees."); *Eason v. Deering Constr., Inc.*, No. 02-19-00310-CV, 2020 WL 7062687, at *8 (Tex. App.—Fort

41

Worth Dec. 3, 2020, no pet.) (mem. op.) ("While Deering's counsel testified to the aggregate amount of fees and the general tasks carried out by himself and his two associates, this sort of evidence has been held to be insufficient."); *Sloane v. Godberg B'Nai B'Rith Towers*, 577 S.W.3d 608, 621 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (reversing fee award where attorney "conceded that he had not allocated hours spent on particular tasks" and billing records did not show time spent on tasks).

The remedy here is to reverse the $25,182.61 fee award and remand the issue to the trial court for a redetermination of attorney's fees. *See Long*, 442 S.W.3d at 256; *Sloane*, 577 S.W.3d at 622 ("The proper remedy in cases where the evidence fails to satisfy the standards for determining fees . . . is to remand the issue for a redetermination of fees."). Kanyezi asserts that this redetermination should also include a redetermination of the amount of the offset for its attorney's fees to which it is entitled as the prevailing party on Appellees' Theft Liability Act claim. Because the record reflects that the error in finding the evidence sufficient to support Appellees' requested attorney's fees also affected the trial court's determination of the offset amount, we agree.

Among its evidence, Kanyezi offered its attorney's billing records and the sworn declaration of its attorney, Laura Haley, who stated that Kanyezi's attorney's fees for 186.3 hours of work, at a rate of $300 per hour, was $55,908. If segregation

of the fees was required, Haley stated that 50 percent of the fees—or $27,954—was for work on the Theft Liability Act claim and the intertwined conversion claim.

In its findings of fact and conclusions of law, the trial court concluded that "Kanyezi was not entitled to a full credit or full offset for the reasonable amounts of its attorneys' fees incurred defending against [Appellees'] Theft Liability Act claim and the claims inextricably intertwined therewith." *See Rohrmoos*, 578 S.W.3d at 502 ("[T]he base lodestar figure can be adjusted down when it is established, based on considerations not already accounted for in the first step, to be an unreasonably high or excessive fee award, creating a windfall for the prevailing party or its attorney."); *Land v. Land*, 561 S.W.3d 624, 639 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("When determining an appropriate fee award, the trial court is entitled to examine the entire record and to view the matter in light of the amount in controversy, the nature of the case, and his or her personal experience as a lawyer or judge." (internal quotation marks omitted)); *see also Mogged v. Lindamood*, No. 02-18-00126-CV, 2020 WL 7074390, at *7–8, 19 (Tex. App.—Fort Worth Dec. 3, 2020, pet. denied) (mem. op.) (holding award of 22% of requested attorney's fees was against great weight and preponderance of evidence, and thus constituted abuse of discretion, and remanding for redetermination).

The trial court determined that "as a Matter of Law . . . reasonable and necessary attorney's fees in favor of Kanyezi as the prevailing party on the Texas

Theft Liability Act claim are $2,500.00." In its sole finding of fact supporting the reduction of Kanyezi's attorney's fees to less than 9% of its requested segregated fees, the trial court indicated that it reduced Kanyezi's fees by taking into consideration the amount of Appellees' attorney's fees, noting that Kanyezi's fees "were significantly higher than [Appellees'] attorney's fees for similar work." Because, as discussed above, the attorney's fees awarded to Appellees were not supported by legally sufficient evidence, and because the trail court's findings indicate that the amount of those fees affected the amount of attorney's fees that the trial court assigned to Kanyezi, we conclude that the offset amount for Kanyezi's reasonable and necessary attorney's fees as the prevailing party under the Theft Liability Act should also be redetermined. *See* TEX. CIV. PRAC. & REM. CODE § 134.005(b) (providing that prevailing party under Theft Liability Act "shall be awarded court costs and reasonable and necessary attorney's fees").

We sustain Kanyezi's fifth and sixth issues.

## Conclusion

We reverse the portion of trial court's judgment awarding Appellees $25,182.61 in attorney's fees and remand the issue to the trial court for a redetermination of attorney's fees, including a redetermination of the offset amount for Kanyezi's attorney's fees. The remainder of the trial court's judgment is affirmed in all respects.

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Farris.